[L. A. No. 21156. In Bank. Apr. 4, 1950.]

JEROME WEBER, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent.

Isaac Pacht, Pacht, Warne, Ross & Bernhard, Clore Warne and Bernard Reich for Petitioner.

Harold W. Kennedy, County Counsel, Wm. E. Lamoreaux, Deputy County Counsel, W. E. Simpson, District Attorney, Jere J. Sullivan and Robert Wheeler, Deputy District Attorneys, for Respondent.

EDMONDS, J.—Jerome Weber, together with Harry M. Lorenson and 11 others, was indicted for conspiracy to com-

mit assault with a deadly weapon, robbery, and to pervert or obstruct justice or the due administration of the laws, all in violation of section 182 of the Penal Code. His application for a writ of prohibition to restrain the superior court from proceeding with the trial of the action presents the same questions as those decided in *Lorenson* v. *Superior Court, ante,* p. 49 [216 P.2d 859].

The facts are fully stated in the opinion in the Lorenson case. From them it may be inferred that Weber's activities were related to and in furtherance of a general conspiracy to pervert and obstruct justice to which Weber, Lorenson and other police officers were a party. Weber's request of Officer Barkley to delay booking of any suspects in connection with a disturbance at Pearson's place of business, and the fact that this request was made almost simultaneously with the attack upon Pearson, reasonably support that conclusion. In considering overt acts of Weber in connection with the entire series of events shown by the record, the grand jury was fully justified in concluding that these occurrences were a part of a common scheme or plan to which Weber was a party.

It cannot be said that such a conclusion is unreasonable or arbitrary. Under the test applied in the Greenberg case, ". . . there is some rational ground for assuming that petitioner is guilty." (*Greenberg* v. *Superior Court,* 19 Cal.2d 319 [121 P.2d 713].) Perhaps, when the conduct of Weber is explained to a trier of fact, he will not be convicted, but the question of his guilt or innocence is not now before this court. The present issue does not concern the quantum of evidence necessary to sustain a judgment of conviction but only the question as to whether the grand jurors, acting as men of ordinary caution or prudence, could conscientiously entertain a reasonable suspicion that a public offense had been committed in which Weber participated.

As stated in *Lorenson* v. *Superior Court,* it cannot be said that the indictment is such an obvious and flagrant disregard of the fundamental rights of the petitioner that the expense, effort and delay of a trial would be an unfair burden upon him. (*Rescue Army* v. *Municipal Court,* 28 Cal.2d 460, 466 [171 P.2d 8].) The circumstances shown by the evidence before the grand jury allow the inference that, either there was a broad plan of which the actions of Weber were a part, or that his activities are unrelated to those of Lorenson, Swan, Cohen, Mold, Wolfe, and the seven Cohen associates. " 'With-

out explanation or contradiction of those facts by the defendant, and which the grand jury had a right to disbelieve, the jurors had the discretion to determine, "in their judgment" whether the evidence would "warrant a conviction by a trial jury." In that event . . . the jury "ought to find an indictment," as it did. We may not interfere with that discretion of the grand jury, or weigh the evidence adduced to determine its sufficiency.' (*McFarland* v. *Superior Court*, 88 Cal.App.2d 153, 158 [198 P.2d 318].)'' (*Lorenson* v. *Superior Court, ante*, p. 49.)

The petition for the peremptory writ of prohibition is denied, and the alternative writ is discharged.

Shenk, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

Petitioner, Weber, is one of the group named in the indictment against Lorenson (*Lorenson* v. *Superior Court, ante*, p. 49). The factual background is the same in both cases.

It will be recalled from the Lorenson case that Weber is an attorney at law practicing in Los Angeles. On the day before the assault on Pearson, he was requested by Lorenson to take Mrs. Phillips' case against Pearson, and agreed to do so. He knew Cohen socially, but he was not his counsel and they were merely casual acquaintances. About 4:10 Saturday afternoon, March 19, 1949, after the arrest of Cohen's associates, but before they had been brought to the Wilshire Station, Weber called that station and inquired whether anyone had been arrested in connection with a disturbance at Pearson's place. Taking the testimony of the officer receiving Weber's telephone call, and Weber's later visit to the station, as we must, that is, the evidence must be viewed in a light most favorable to support the indictment, we find that Barkley testified: "He [Weber] asked me if there had been two or three suspects brought in from some kind of a disturbance of the peace or fight or something, and I told him that I didn't know of any and, furthermore, if they had been brought in for disturbing the peace or anything like that they would probably be taken downstairs and not up to the detective bureau as it was not a felony. Q. What did he say? A. He said, 'Well, if they are brought in will you hold up the booking until I arrive?' . . . And at that time another voice got on the phone, one which I recognized. Q. And whose voice was that? A. That was Burt Burton [Burt Mold] Q. Who is

Burt Burton? A. Well, from all my—all that I know of him was that he was in the clothing business down here, I believe it is in the 300 block on Main Street. I bought several suits from his store. And he asked me substantially the same questions. Q. That Weber had? A. Yes. Q. Did he say anything about the identity of any of the persons who might be involved? A. He did, yes. Q. What did he say about that? A. He mentioned two or three names. Q. Would you recognize any of them if you heard them? A. I would recognize one, or two, possibly. I wouldn't, however, be positive of all three of them. . . . Q. Eli Lubin? A. That could have been one of them. Now, I am not positive of it. . . . Q. Harold Meltzer? A. That could have been one of them. Q. Dave Ogul? A. That was one. I am sure of that. . . . Q. Did he [Mold] say anything about his having any knowledge of why they might be brought in? A. I asked him about that and he said he didn't know exactly, that it was over some kind of a beef—a little disturbance of the peace or a fight or something. . . . Q. Did you later see Burton [Mold]? A. Yes. Q. How much later? A. Oh, I would say anywheres from five to fifteen minutes, maybe, after the suspects left the office. Q. And was Weber with him? A. He was. Q. That is Jerry Weber, a lawyer? A. Jerry or Jerome, or something like that. He introduced himself as a lawyer. . . . Q. What conversation did you have with those gentlemen? A. Well, they came up to this desk in the outer office, or the counter—(indicating) . . . They came right up here, and when they walked up I was sitting back here talking to this girl, and I walked up to the desk and talked to them. And I still didn't connect the two deals together. They were referring to two or three suspects being brought in over a disturbance of the peace. And at the time I walked up to the desk I asked him where they were brought in from, and when he told me that it was from a radio shop, Sky Pilot or something like that, I immediately connected the two then, and I told him that there was no one booked.'' Weber testified that a person who said he was Pearson telephoned him about 4 p. m. stating that you have some ''blank-blank pickets'' and you better get them away or there would be some ''heads bashed.'' He also stated that a newspaper reporter had telephoned him about the assault but from the evidence it may be inferred that such call was after Weber had called Wilshire Station. Mold, an intimate friend of Weber, who usually dropped in to see him, was present when Weber called the

Wilshire Station and spoke to Officer Barkley whom he knew, and introduced Weber stating that he would appreciate any favors extended him. He asked if any suspects in connection with Pearson had been brought in and specifically referred to Ogul.

The foregoing establishes nothing more than a suspicion that Weber had a connection with the conspiracy, and all that appears is that he knew Cohen and Lorenson and had some foreknowledge that something had occurred at Pearson's, and was counsel for Mrs. Phillips in a controversy between her and Pearson. Even if his testimony that he received knowledge of this trouble at Pearson's by the telephone call from a person representing himself as Pearson is disbelieved, the case is no stronger. Mere foreknowledge that some trouble is brewing and his acquaintance with the alleged conspirator Cohen is not enough. In the course of his representation of Mrs. Phillips against Pearson, he had adequate reason for being interested in any developments touching Pearson and accordingly in contacting the Wilshire Station.

There is absolutely no evidence connecting petitioner with the commission of any crime, and, therefore, the indictment against him is wholly unsupported.

I would grant the writ of prohibition prayed for by him.

Gibson, C. J., and Traynor, J., concurred.