242 Cal.App.2d 442 (1966)
THE PEOPLE, Plaintiff and Appellant,
v.
ETHEL PEASE et al., Defendants and Respondents.
Crim. No. 5190. 
California Court of Appeals. First Dist., Div. One. 
May 25, 1966.
 Thomas C. Lynch, Attorney General, Derald E. Granberg, Edward P. O'Brien and Robert S. Shuken, Deputy Attorneys General, for Plaintiff and Appellant.
 Edward T. Mancuso, Public Defender, and James G. Magee, Deputy Public Defender, for Defendants and Respondents.
 SULLIVAN, P. J.
 These are appeals in two separate cases. In 1 Crim. 5190 defendants Ethel Pease, James B. Valentine and Manuel B. Mattos were charged in an information with possession of a narcotic (percodan). (Health & Saf. Code, 11500.) Their motion to set aside the information was granted (Pen. Code, 995) [fn. 1] and the People appeal. In 1 Crim. 5191 defendant Ethel Pease alone was charged in an information with two counts of receiving stolen property ( 496). Her motion to set aside the information was granted ( 995) and the People appeal. All of the offenses were charged as having been committed on January 6, 1965, arose out of the same incident and can be set forth in a single statement of facts. [fn. 2] Basically both cases present a single issue: Whether on the occasion in question the forcible entry by the police was legally made and the evidence thereafter seized by them legally secured.
 At the preliminary hearing San Francisco Police Inspector Yasinitsky testified that on January 6, 1965, he and Inspector Webb went to the premises at 1845 Bush Street, San Francisco, because they had received information from fellow officers Hurley and Dickson that William Bert Schindler, a wanted felon for whom they had two arrest warrants, was living in room 5 of the flat there located. They rang the front door bell and knocked on the front door but did not receive a reply. They went around to the back, climbed the stairs to the second *444 floor, knocked on the door and declared they were police. There was no reply. They then returned to the front door, rang the doorbell and knocked loudly on the door. Although they could hear footsteps above them they received no reply. Once more they proceeded to the back door where they heard footsteps and voices. They declared they were police, demanded entrance and threatened to break down the door if they were not admitted. There was still no reply.
 The officers then tried to gently nudge the door open. They "heard what sounded like running, hastily walking, hasty footsteps" and so Yasinitsky hit the door with his foot and caused it to open. The door was barred with a 2 X 4 on the inside, but the officers made their way into the flat.
 From the back porch they entered into the kitchen where they saw defendant Mattos standing by the sink. Defendant Ethel Pease was also in the kitchen area and shortly thereafter Valentine also entered that area from another room. The officers heard a toilet being flushed. They identified themselves and asked where Schindler was.
 Inspector Yasinitsky further testified that he continued through the kitchen to the living room while Webb passed into an adjacent corridor. Immediately upon entering the living room Yasinitsky saw in plain sight on a table an eye-dropper with a hypodermic needle attached, a honing stone, a magnifying glass, alcohol, a tong, a spoon with a charred bottom and other narcotic users' paraphernalia. On the table top was a residue of a yellowish paste "which looked like it was wiped off"; some of the residue was also in a wastepaper basket. The above articles and yellow substance were not immediately seized for the officers, hoping to find Schindler on the premises, continued to make a search for him. They were later advised that he had moved from the flat that morning.
 Unsuccessful in finding Schindler, Yasinitsky and Webb proceeded to seize the paraphernalia on the living room table. Yasinitsky wiped off the yellow residue and picked up the paste from the wastepaper basket. Webb gathered up the refuse from the toilet where it was still swirling around because that fixture was defective.
 The officers then made a thorough search of the premises, uncovering the following: two yellow pills (stipulated to be percodan) found in a case behind a vase in the living room; a case "with a couple of bindles in it" found in the corridor; several hypodermic needles found in closets; "some matter that looked like marijuana seed," burned spoons and hair-thin *445 wires used to clean hypodermic needles, all found in a room near the back porch. Only the cache of seed was seized from that room, however. In addition, the officers seized certain cancelled checks, business cards, an address book and a checkbook belonging to two victims of auto boostings. These items were found scattered throughout Mrs. Pease's bedroom. The officers then placed defendants under arrest.
 The motions to set aside the informations in both cases were heard and granted at the same time. Basically the court's action rested upon a determination that the inspectors lacked reasonable cause to believe that Schindler was on the Bush Street premises. The record discloses that in reaching this conclusion the learned trial judge specifically rejected the district attorney's contention that the fact that Inspector Yasinitsky had obtained his information about Schindler from fellow officers constituted per se reasonable grounds for believing Schindler to be in the flat and therefore justified their forcible entry. [fn. 3] The Attorney General renews the same contention before us. We have concluded that the trial court's rulings were correct and that the orders made in both cases should be affirmed.
 [1] Section 844 provides in pertinent part: "To make an arrest ... a peace-officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired." (Italics added.)
 The term "reasonable grounds" as used in section 844 is the substantial equivalent of the terms "reasonable cause" and "probable cause" as used in constitutional and statutory provisions pertaining to the issuance of a search warrant (U.S. Const., 4th Amend.; Cal. Const., art. I, 19; 1525), an arrest without a warrant ( 836), a commitment by a magistrate or an indictment by a grand jury ( 995). (See Wong Sun v. United States (1963) 371 U.S. 471, 478, fn. 6 [83 S.Ct. 407, 9 L.Ed.2d 441]; Draper v. United States (1959) 358 U.S. 307, 310, fn. 3 [79 S.Ct. 329, 3 L.Ed.2d 327]; United States v. Elgisser (2d Cir. 1964) 334 F.2d 103, 109; People v. Morfield *446 (1964) 41 MisCal.2d 935 [246 N.Y.S.2d 451, 452].) [fn. 4] The standard or test of reasonable or probable cause applicable to all of the last mentioned situations, namely, to the issuance of a search warrant, an arrest without a warrant, a commitment by a magistrate or an indictment by a grand jury is approximately the same (People v. Aday (1964) 226 Cal.App.2d 520, 532-533 [38 Cal.Rptr. 199], cert. denied 379 U.S. 931 [85 S.Ct. 329, 13 L.Ed.2d 343]; Williams v. Justice Court (1964) 230 Cal.App.2d 87, 94 [40 Cal.Rptr. 724]; People v. Govea (1965) 235 Cal.App.2d 285, 296 [45 Cal.Rptr. 253]; Galena v. Municipal Court (1965) 237 Cal.App.2d 581, 586 [47 Cal.Rptr. 88]) [fn. 5], that is, "such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." (People v. Nagle (1944) 25 Cal.2d 216, 222 [153 P.2d 334]; in accord: Jackson v. Superior Court (1965) 62 Cal.2d 521, 525 [42 Cal.Rptr. 838, 399 P.2d 374]; People v. Ketchel (1963) 59 Cal.2d 503, 532 [fn. 6] [30 Cal.Rptr. 538, 381 P.2d 394]; Perry v. Superior Court (1962) 57 Cal.2d 276, 283 [19 Cal.Rptr. 1, 368 P.2d 529]; Cotton v. Superior Court (1961) 56 Cal.2d 459, 462 [15 Cal.Rptr. 65, 364 P.2d 241]; Robison v. Superior Court (1957) 49 Cal.2d 186, 188 [316 P.2d 1]; Rogers v. Superior Court (1955) 46 Cal.2d 3, 7-8 [291 P.2d 929]; Bompensiero v. Superior Court (1955) 44 Cal.2d 178, 183 [281 P.2d 250], cert. denied, 349 U.S. 914 [75 S.Ct. 602, 99 L.Ed. 1248]; Callan v. Superior Court (1962) 204 Cal.App.2d 652, 661 [22 Cal.Rptr. 508].)
 [2] Where reasonable cause is predicated on information communicated by others, evidence must be presented justifying the conclusion that reliance on such information is reasonable. (Willson v. Superior Court (1956) 46 Cal.2d 291, 294-295 [294 P.2d 36].) Thus we said in People v. Brice (1965) 234 Cal.App.2d 258, 265-266 [44 Cal.Rptr. 231], "It is settled that in the absence of a pressing emergency, an arrest without a warrant may not be based solely upon information received by the police from an informant not known to the arresting officers, *447 or if known, not known to be reliable. [Citations.]" [fn. 7] In Galena v. Municipal Court, supra, 237 Cal.App.2d 581, 587 we discussed probable cause in connection with the issuance of a search warrant. In that case we said: "It is settled law that the requisite probable cause 'may be based on information furnished by an informant if the supporting affidavit also recites facts indicating that reliance on the information is reasonable. [Citations.]' (People v. Keener, supra, 55 Cal.2d 714, 721 [12 Cal.Rptr. 859, 361 P.2d 587]; [citations [fn. 8]].) In other words, the magistrate's finding of probable cause may rest upon the hearsay statement of the informant 'so long as a substantial basis for crediting the hearsay is presented.' (Jones v. United States (1960) 362 U.S. 257, 269 [80 S.Ct. 725, 4 L.Ed.2d 697, 707, 78 A.L.R.2d 233]; [citations [fn. 9]].)"
 [3] Just as in the foregoing situations, where an arrest is made without a warrant or a search warrant is issued, the requisite reasonable or probable cause may be based on the hearsay statement of an informant provided he is a reliable informant, so also in situations like the present one, where forcible entry of a house is effected in order to make an arrest, the requisite reasonable grounds for believing the person to be arrested to be inside may be based on the hearsay statement of an informant provided he is a reliable informant. [4] Generally speaking, in determining whether there are "reasonable grounds" within the meaning of section 844, as in determining whether there is probable cause in the other situations above-mentioned, each case must be decided on its own facts and circumstances. (See People v. Ingle (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 4, 348 P.2d 577], cert. denied, 364 U.S. 841 [87 S.Ct. 79, 5 L.Ed.2d 65]; People v. Brice, supra, 234 Cal.App.2d 258, 266; People v. Govea, supra, 235 Cal.App.2d 285, 297.) *448
 In the instant case the only grounds which Inspectors Yasinitsky and Webb had for believing Schindler to be in the house consisted of the information received by Yasinitsky from Officers Dickson and Hurley to the effect that Schindler was living in room 5 of the flat. [fn. 10] It does not appear that the latter two officers obtained this information from official police files or by their personal observation. Neither of said officers testified as to the source of their information or the reliability of any original informant. How they "ascertained" what they told Yasinitsky does not appear from the record. At the hearing of the motion to set aside the information the People took the position that the inspectors were entitled to rely on the information merely because it emanated from a fellow officer. Substantially the same argument is now made before us. It is urged that the statements made by Dickson and Hurley to Yasinitsky constituted information from an official source whose reliability must be presumed unless the contrary is shown. In support of this position the Attorney General cites, among others, the decision of Division Two of this court in People v. Schellin (1964) 227 Cal.App.2d 245 [38 Cal.Rptr. 593], cert. denied, 379 U.S. 1003 [85 S.Ct. 726, 13 L.Ed.2d 704].
 We think the present case falls more properly within the principle enunciated in the earlier case of People v. Harvey (1958) 156 Cal.App.2d 516 [319 P.2d 689], also a decision of Division Two of this court. There it was held that probable cause for an arrest was not established by the testimony of the arresting officer that he had received certain information (leading to the defendant's arrest) from his superior officer who had told his subordinate that he in turn had received such information from a reliable informer. The superior officer was dead at the time of trial and thus unable to testify as to the source of the information. The court said: "It seems clear to us that if a superior police officer has reliable information which would justify him in making an arrest himself, he can delegate the making of the arrest to a subordinate, and justify the arrest by the subordinate by his (the superior's) knowledge. To permit the subordinate to justify the arrest on the *449 superior's unsworn statement to the subordinate that the superior has obtained information from another justifying the arrest, however, would permit police officers to justify arrests by hearsay on hearsay, without requiring the sworn testimony of anybody that the information upon which the arrest was made was actually given to any police officer. To allow this would permit the manufacture of reasonable grounds for arrest within a police department by one officer transmitting information purportedly received by him from an informer to another officer who had not received such information from the informer, without establishing under oath that the information had in fact been given to any officer by the informer, or indeed that there was an informer at all. The possibilities of the phantom informer, if this were to be permitted, are too obvious to need elaboration. (Cf. People v. Lawrence, 149 Cal.App.2d 435, 451 [308 P.2d 821].)" (Italics added.) (156 Cal.App.2d at pp. 523-524.)
 This rationale is applicable to the facts of the present case. In essence the Attorney General argues that the statement that Schindler was in the house was reliable merely because the other officers made it. Such circumstance without more does not make the fellow officers an official source or their statements official information. If this were so, every utterance of a police officer would instantly and automatically acquire the dignity of official information; "reasonable cause" or "reasonable grounds," as Harvey points out, could be conveniently fashioned out of a two- step communication; and all Fourth Amendment safeguards would dissolve as a consequence. The present case is distinguishable from those cases where the source of the information is official police files or records (see People v. Stewart (1961) 189 Cal.App.2d 176 [10 Cal.Rptr. 879], arresting officer radioed police department for record check and advised of outstanding traffic warrant; People v. Davis (1962) 205 Cal.App.2d 517 [23 Cal.Rptr. 152], arresting officer acquired information from vice detail files in sheriff's office; People v. Esters (1963) 220 Cal.App.2d 917 [34 Cal.Rptr. 264], officers arresting for burglary relied on "Hot Sheet" issued by police department for list of stolen property; People v. Schellin, supra, 227 Cal.App.2d 245, arresting officer in Napa County relied in part on information from Intelligence Unit of Oakland Police Department, [fn. 11]) or where *450 the source of the information is a reliable informer and the arresting officer receives such information through a conduit of fellow officers. (See People v. Hood (1957) 150 Cal.App.2d 197 [309 P.2d 856]; People v. Melchor (1965) 237 Cal.App.2d 685 [47 Cal.Rptr. 235].) In Melchor the crucial information came from the reliable informant (a special police officer or patrol special officer) to the arresting police inspector through the latter's fellow officers. We held that this did not prevent reliance on its trustworthiness since it reached the arresting officer through the conduit of police channels and since the officers first receiving and transmitting the information were reasonably entitled to rely upon the informant. (People v. Melchor, supra, 237 Cal.App.2d 685, 690.)
 [5] From the above authorities we think the following principle can be distilled: That the mere fact that information acquired by an arresting officer comes from a fellow officer as a hearsay statement not based on the latter's personal observations does not justify the conclusion that reliance thereon is reasonable in the absence of evidence showing that the informant originally transmitting the information to the police was reliable or that such information had its source in official police files or records. Absent the conditions indicated above, such statements of a fellow officer, being hearsay on hearsay, cannot by themselves constitute reasonable cause or reasonable grounds for police action of the kind here involved. We conclude that the information relied upon by the People in the instant case was insufficient to justify the forcible entry of the premises.
 We do not discuss the other cases cited by the Attorney General since they involve information received from a reliable informant or other reliable sources and are thus distinguishable from the case before us.
 Finally, we point out that the trial judge granted the motions to set aside the informations "without prejudice to ... [the People's] right to refile and establish probable cause." In view of the People's apparent disinclination to do so, we can assume that the testimony found in the present record constitutes in fact the strongest case which they can present. *451
 The order setting aside and dismissing the information in No. 5190 and the order setting aside and dismissing the information in No. 5191 are, and each of them hereby is, affirmed.
 Molinari, J., and Sims, J., concurred.
NOTES
[fn. 1] 1. Hereafter, unless otherwise indicated, all section references are to the Penal Code.
[fn. 2] 2. The preliminary hearing on the charges against all three defendants was held before the preliminary hearing on the charges against Ethel Pease alone. By stipulation the record in the first preliminary hearing, consisting solely of the testimony of San Francisco Police Inspector Yasinitsky, was made a part of the record of the second preliminary hearing. At this second hearing Inspector Yasinitsky again testified; in addition the People called two other witnesses.
[fn. 3] 3. The trial judge said: "I am bound by some rules and under the rules that exist, I think that there should be some sort of a showing as to just what this information was, where they got it, and who it came from. Otherwise, on this basis, anybody could tell a policeman anything about a wanted felon being somewhere and that would give the police the right to go there and break down the door."
[fn. 4] 4. No reported California case has been cited to or discovered by us which expressly holds that the above terms are substantial equivalents. It is to be noted that the term "reasonable ground" (as distinguished from reasonable grounds) is used in relation to the issuance of an arrest warrant by a magistrate ( 813, 1427).
[fn. 5] 5. The terms "reasonable cause" and "probable cause" are themselves synonymous. (Masterson v. Pig'n Whistle Corp. (1958) 161 Cal.App.2d 323, 335 [326 P.2d 918].)
[fn. 6] 6. Overruled on other grounds in People v. Morse (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33].
[fn. 7] 7. Citing Willson v. Superior Court, supra, 46 Cal.2d 291, 294-295; People v. Reeves (1964) 61 Cal.2d 268, 273 [38 Cal.Rptr. 1, 391 P.2d 393]; People v. Bates (1958) 163 Cal.App.2d 847, 851 [330 P.2d 102]; People v. Burke (1962) 208 Cal.App.2d 149, 155-156 [24 Cal.Rptr. 912]; People v. Swayze (1963) 220 Cal.App.2d 476, 487 [34 Cal.Rptr. 5].)
[fn. 8] 8. Citing Williams v. Justice Court, supra, 230 Cal.App.2d 87, 95-96; Dunn v. Municipal Court (1963) 220 Cal.App.2d 858, 871 [34 Cal.Rptr. 25]; People v. Prieto (1961) 191 Cal.App.2d 62, 69 [12 Cal.Rptr. 577]; People v. Perez (1961) 189 Cal.App.2d 526, 532 [11 Cal.Rptr. 456].)
[fn. 9] 9. Citing Rugendorf v. United States (1964) 376 U.S. 528, 533 [84 S.Ct. 825, 11 L.Ed.2d 887, 891]; Aguilar v. Texas (1964) 378 U.S. 108, 114 [84 S.Ct. 1509, 12 L.Ed.2d 723, 729]; United States v. Ventresca (1965) 380 U.S. 102, 108 [85 S.Ct. 741, ___, 13 L.Ed.2d 684, 688-689].
[fn. 10] 10. Yasinitsky testified: "Q. [By deputy district attorney] How did you have occasion to respond to this location? A. We had information that a wanted felon for whom we had a warrant and other warrants was living there in room 5 of that flat. ... Q. And what was the information you had that Mr. Schindler was located on these premises? A. The information I received from Officer Dickson and Officer Hurley. Mr. Schindler was accused of stealing and they ascertained that Mr. Schindler indeed lived in that flat."
[fn. 11] 11. The opinion states: "The Napa sheriff's office has been advised by Sergeant Dahl of the Intelligence Unit of the Oakland Police Department that they had observed a vehicle with known burglary suspects going north on the freeway on the evening of March 14. The information supplied by the Oakland police was that two or three male subjects in a 1960 Nash Rambler were intent on burglarizing a place that contained a safe on the highway north of Napa. The license number of the vehicle was given." (227 Cal.App.2d at p. 247.)